IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LEO RICK DURAN,

      **Plaintiff,**

v.                                          **No. 1:23-cv-00002-JHR**

MARTIN J. O'MALLEY, Commissioner
of Social Security,

      **Defendant.**

## MEMORANDUM OPINION AND ORDER AFFIRMING THE COMMISSIONER'S FINAL DECISION AND DENYING PLAINTIFF'S MOTION TO REMAND

Before the Court is Plaintiff Leo Rick Duran's Motion to Reverse and Remand [Doc. 19]. The Commissioner filed a response [Doc. 26] and Duran replied. [Doc. 27]. Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties consented to Magistrate Judge Jerry H. Ritter resolving Duran's challenge to the Commissioner's final decision on his application for Social Security benefits and entering final judgment in this appeal. [Doc. 9].  Having reviewed the parties' briefing and the Administrative Record, the Court finds that Duran's arguments do not warrant remand and therefore the Court will **DENY** Duran's Motion and **AFFIRM** the Commissioner's final decision denying benefits under the Social Security Act.

## I.  BACKGROUND AND PROCEDURAL HISTORY

Duran filed his application for disability insurance benefits and supplemental security income on July 5, 2016. [Doc. 19, p. 2]. In the application he alleged disability based on diabetes, depression, bladder/prostate issues, and a hernia. *Id.* Duran's claim was first denied on April 23, 2018. *Id.*  He appealed to this Court and Judge Vidmar remanded the case for further proceedings after finding that Administrative Law Judge ("ALJ") Grontis applied in the incorrect legal standards in weighing opinion evidence. *Id.* ALJ Grontis again denied his claim and he again

appealed to federal court, which resulted in a voluntary remand to explain inconsistencies regarding mental abilities, further explain the effects of insomnia and prostate issues, and further consider Dr. Parmley's opinion. *Id.* at 2-3. ALJ Holappa held a hearing to address these issues and ultimately found Duran not disabled in a written opinion on September 7, 2022, as further described below. *See* [Doc. 13-15, p. 35, 36]. The Appeals Council denied review of that decision, rendering it the final decision of the Commissioner.

Duran appeals the final decision on several bases. *See* [Doc. 19]. First, Duran contests the ALJ's residual functional capacity ("RFC") assessment, arguing that is it the product of errors at step two and in evaluation of opinion evidence. *Id.* at 1. Duran says that the ALJ failed to cure the errors upon which the Appeals Council based its prior remand order. *Id.* at 1. Second, Duran asserts that the ALJ erred at step five by failing to incorporate all limitations into a hypothetical question to the vocational expert concerning the reasoning level of the jobs identified. *Id.* at 2-3. The Commissioner responds that substantial evidence supports the RFC because the ALJ assessed opinion evidence in compliance with articulation requirements, reasonably deemed Duran's insomnia and prostate issues to be non-severe while also accounting for them in the RFC, and supported the step five findings with substantial evidence free from any unresolved apparent conflicts with the Dictionary of Occupational Titles ("DOT"). [Doc. 26].

## II.    DETAILS OF THE COMMISSIONER'S FINAL DECISION

A claimant seeking disability benefits must establish that he is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).

The Administration must apply a five-step analysis to determine eligibility for benefits. 20 C.F.R. § 404.1520(a)(4).[1]

### A. Step 1 and Step 2

At step one of the sequential analysis, the ALJ noted that Duran had worked since his alleged onset date of July 5, 2016. AR at 1596. However, he declined to make a finding on substantial gainful employment because the step five finding showed that Duran had not been disabled since the alleged onset date. AR at 1597. At step two, he found that Duran has six severe impairments: diabetes mellitus with diabetic neuropathy, hypothyroidism, hernia, depression, anxiety, and mild neurocognitive disorder. *Id.* The ALJ also explained that Duran has numerous non-severe impairments: hypertension and hyperlipidemia, psoriasis, irritable bowel syndrome, bilateral dry eye syndrome, bilateral pseudoexfoliation syndrome, bilateral cataracts, bilateral presbyopia, cannabis use disorder, obstructive sleep apnea, insomnia, vitamins D and B12 deficiency, and benign prostatic hyperplasia. AR at 1598.

### B. Step 3

At step three, the ALJ determined that Duran's impairments, individually and in combination, did not meet or medically equal any impairment listed in Appendix 1 to C.F.R. Title 20, Part 404, Subpart P. AR at 1600. The ALJ explained that no medical evidence demonstrates that Duran needs a cane, walker, or crutches to ambulate: he showed a normal, steady walking gait with good strength absent any assistive device. *Id.* Nor did he have trouble standing or using his arms. AR at 1601. The ALJ also analyzed Duran's mental condition and found that he did not meet

---

[1] These steps are summarized in *Allman v. Colvin*, 813 F.3d 1326, 1333 n.1 (10th Cir. 2016). Regulations for determining whether a claimant is disabled for purposes of for both DIB and SSI are identical but are nonetheless codified in two separate parts of the Code of Federal Regulations. Part 404 of Title 20 governs DIB while Part 416 governs SSI. The Court cites only the applicable regulations in Part 404, but the analogous regulations in Part 416 apply as well.

the criteria for a mental impairment listing under "paragraph B." AR at 1604. The ALJ assessed Duran with moderate limitations in each of the four broad mental functioning categories ((1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting and manage oneself) and explained his reasoning. AR at 1602-1604.  The ALJ further found that no "paragraph C" criteria were satisfied because Duran did not have recurrent psychiatric hospitalizations nor trends of suicidal gestures or intent. AR at 1604.

### C.  Residual Functional Capacity.

When a claimant does not meet a listed impairment, the ALJ must determine the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e).  The RFC is a multidimensional description of the work-related abilities a claimant retains despite his impairments. 20 C.F.R. § 404.1545(a)(1).  It "does not represent the *least* an individual can do despite his or her limitations or restrictions, but the *most*."  SSR 96-8p at *Definition of RFC*. The ALJ determined that Duran could perform medium work with the following limitations:

> [T]he undersigned finds that the claimant has the residual functional capacity to perform medium work . . . including lifting/carrying up to 50 pounds occasionally and 25 pounds frequently, sitting up for 6 hours in an 8-hour day, standing/walking up to 6 hours in an 8-hour workday, and pushing/pulling as much as the claimant can lift carry [sic]. However, the claimant is further limited nonexertionally. The claimant is limited to frequent climbing of ramps and stairs, but never climbing ladders or scaffolds, and limited to no exposure to unprotected heights or moving mechanical parts. Finally, claimant is limited to understanding, remembering, and carrying out simple, routine, repetitive, 1-3 step instructions; making simple work-related decisions; dealing with occasional changes in a routine work setting; performing work that does not involve assembly line pace, maintaining concentration, persistence, and pace for at least two-hour intervals over a normal 8-hour workday, 40-hour workweek, with standard breaks; and occasionally interacting with supervisors and co-workers, but never interacting with the general public.

AR at 1605.

The ALJ considered all of Duran's symptoms and the consistency of those symptoms with the record evidence, medical or otherwise, as required by 20 C.F.R. §§ 404.1520c, 404.1529, and SSR 16-3p. AR at 1605.  The ALJ followed the two-step process for assessing Duran's symptoms. *Id*. The first step is determining whether an underlying medically determinable physical or mental impairment exists that could reasonably produce Duran's symptoms. *Id.* The second step is evaluating  the intensity and limiting effects of Duran's symptoms to determine the extent they limit his work-related activities. *Id.*

The ALJ thoroughly analyzed the medical and opinion evidence to explain his RFC finding. AR at 1606-1620. He determined that Duran's claimed impairments reasonably produce his symptoms but their alleged intensity, persistence, and limiting effects "are not entirely consistent with the objective medical and other evidence." AR at 1606. The Court will summarize the ALJ's discussion.

### 1.  Medical History Summary

 The ALJ first noted that Duran claims disability due primarily to depression and anxiety which interfere with his concentration, memory, and ability to manage stress. AR at 1605, 39, 49. Duran also cites his uncontrolled diabetes and effects therefrom as another basis for disability. AR at 1605. The ALJ first discussed the symptoms and medical evidence concerning Duran's diabetes and found them inconsistent. AR at 1606. He observed that Duran uses insulin to manage his A1c and glucose levels, which his providers adjust as necessary. *Id.* The ALJ noted that Duran's diabetes "has been without complications such as a diabetic coma, diabetic ketoacidosis, or hospitalization for low or high blood sugar" during the relevant period. *Id.* The ALJ recounted that Duran said he quit working because of dizziness (which made him afraid of falling) and frequent urination and that Duran thought he would get unemployment or disability but instead became

homeless. *Id.* The ALJ compared Duran's physical examination results, noting that he did not have frequent falls or urinary accidents, had normal balance and hand eye coordination, and experienced urinary frequency mainly at night. *Id.*   He also compared Duran's claimed concentration difficulties with his normal attention span upon examination. AR at 1607.

The ALJ chronologized Duran's motor symptoms and examination results from 2016 through 2019. AR at 1607-1608. He described Dr. Manole's 2016 consultative examination where Duran showed a slight sensory decrease in his toes but could still balance, squat and rise, tandem walk, and hop on either foot, and exhibited normal strength and range of motion. AR at 1607. The ALJ also noted that in 2017, 2018, and 2019 Duran showed mild peripheral neuropathy but otherwise normal unassisted gait and foot strike and general satisfaction with his pain and functioning levels. *Id.* In fact, in 2019, Duran said walking helped him manage anxiety. *Id.* He also mentioned that in 2020 Duran still had normal feet and rode his bike every other day. AR at 1608.

The ALJ discussed Duran's hypothyroidism and hernia issues. AR at 1608. He documented normal TSH levels in 2016 but in 2018 Duran began medication after higher TSH results; his levels were normal again in 2022. *Id.* While Duran reported fatigue, the ALJ noted the absence of physical examinations corroborating excessive fatigue. *Id.*

Regarding the hernia, the ALJ compared Duran's claims of inability to lift over 20 pounds for work at a mattress factory which involved carrying and stacking mattresses. *Id.* The ALJ also considered that Duran had required "little treatment" and no surgery, and examinations showed good strength and no objective distress. *Id.*   Thus, he concluded that Duran's "allegations of inability to lift more than 20 pounds due to the hernia are at odds with the more benign findings and limited treatment." *Id.*

6

The ALJ dedicated substantial analysis to Duran's mental impairments. AR at 1608-1618. The ALJ concluded that Duran's mental impairments are "less limited than alleged" because of "notable inconsistencies" with the medical evidence. AR at 1608. He documented that in July 2016 Duran reported fatigue from sleep interruption but presented as oriented and engaged. AR at 1608-09 (noting also that Duran voiced passive suicidal thoughts once with no plan or ideation). The following August, Duran asked for more treatment options for depression but still did not show acute distress. AR at 1609. Duran then failed to report and start medication, but when seen again in September (and despite being unmedicated) he appeared constricted but calm and logical, reported some past suicidal and homicidal thoughts with no plan, and was willing again to start medication. *Id.*   The ALJ summarized Duran's October 2016 psychological consultative examination for his disability and supplemental security applications where he scored nearly perfect on a mini mental status exam, had average intellectual functioning, and lacked hallucinations or delusions. AR at 1610.

The ALJ described Duran's provider encounters in 2017 as a similar pattern of generalized anxiety and depression, medication adjustments, and vague suicidal thoughts without hallucinations or paranoia. AR at 1610-1611. Regarding a June 2017 appointment the ALJ noted:

> [Duran] indicated that while he had suicidal ideations at times with a plan to hang himself, he had no intent or history . . . he sought services when he was feeling overwhelmed, which were very helpful. Depressive feelings were described as only transitory generally related to having a particularly difficult time when homeless. He denied any psychosis, including hallucinations He also indicated that this indicated that this generally resolved quickly.

AR at 1611. The ALJ further recorded that Duran declined hospitalization and did not meet the standard to be involuntarily admitted. *Id.*

The ALJ considered that Duran struggled more in 2018, beginning in January with a 10-day inpatient hospitalization due to suicidal ideations with "increasing intrusive thoughts of suicide

by hanging from a specific tree" and altercations with strangers. *Id.* Moreover, the ALJ contextualized this inpatient stint with "significant psychosocial stressors, decreased self-care, decreased effective social communication and use of recovery-oriented skills" which improved during hospitalization. *Id.* The ALJ considered that Duran showed a "concerning deficit in executive function" but agreed to continue medication, showed normal thought process, fair insight, and did not appear to respond to internal stimuli. AR at 1612 (noting that discharge records found a psychotic disorder highly unlikely).

After some subjective reports of increased auditory hallucinations and a head CT exam ruling out intracranial issues, Duran was evaluated in May 2018. AR at 1612-613. The ALJ documented: Duran had a low average in word reading, a mild impairment in verbal learning, no signs of rapid forgetting, but some decline in executive functioning attributable to depression and anxiety (and unlikely to be due to "minimal white matter disease"). *Id.* He further noted that Duran needed a refill of Seroquel in order to sleep, which "suggested admittedly good improvement in sleep and mood with medication." AR at 1612.

Throughout the remainder of 2018 and early 2019 Duran continued to report command hallucinations but presented well, did not appear to respond to internal stimuli, denied suicidal thoughts, and experienced good medication results. AR at 1613. In late 2019 through 2020 he continued to report auditory hallucinations but still no observed internal stimuli response or psychosis were noted. AR at 1614. The ALJ observed that Duran's mental status was within normal limits in September 2020. *Id.*

Regarding 2021, the ALJ considered that Duran seemed more depressed, still endorsed non-distressing audio hallucinations  without internal stimuli response, reported suicidal ideations once, and continued his medication but declined therapy. For 2022, the medical evidence remained

largely the same with some sleep and calmness improvement due to medication changes and fewer suicidal thoughts. AR at 1615.

Based on the medical evidence, the ALJ made findings on each claimed condition. AR at 1615, 1616. First, he concluded that Duran's fatigue allegations are "not consistent with and out of proportion to the objective medical evidence" because the "overwhelming evidence" showed that he rarely appeared tired or fatigued and was never unawake or "inalert" [sic]. AR at 1615. Second, the ALJ found that Duran's subjective hallucination reports (including suicidal commands) were not as limiting as alleged. *Id.* He concluded that while Duran said he heard voices almost every day, the objective evidence "routinely failed to show any supporting signs" like inappropriate behavior, delusions, or internal stimuli responses. *Id.* (noting that Duran said the hallucinations were "not distressing"). The ALJ also reasoned that only one hospitalization, no suicidal gestures or attempts, and improvement with medication undermined Duran's allegations. *Id.* Finally, he noted that Duran's cognitive abilities were largely within normal limits. AR at 1616. Thus, the ALJ concluded that Duran's "medically determinable impairments are not limiting to the extent alleged and . . . are adequately compensated for by the [RFC]." *Id.*

2.   Medical Opinion Summary

The ALJ next explained how the RFC adequately accounts for Duran's impairments as shown by the medical opinion evidence. *See* AR at 1616-1621. The ALJ methodically discussed how he considered each provider assessment. *See id.*

a.   *Dan Hamill, PhD.*

He first explained why he gave the greatest weight to the opinion of Dan Hamill, PhD—"a nonexamining source with a specialization in psychological impairments"— regarding mental limitations. AR at 1616. The ALJ agreed with Dr. Hamill's opinion, which he deemed supported

by "careful analysis and supporting evidence" after Dr. Hamill's full review of the medical record

(including evidence not available earlier):

> Dr. Hamill's medical opinion is best aligned with the medical evidence with only a slight adjustment. [Duran] has been limited to not only simple, repetitive (1-3 step tasks) but also routine work and occasional interaction with supervisors . . . because he had some vague thoughts to hurt past supervisors that treated him poorly; thus, even though he did not have true homicidal intentions or plans and has been cooperative and friendly, inclusion of a limitation for occasional interaction with supervisors is also indicated [record citation]. Further, routine work is also indicated by detailed evaluation in May 2018 showing some decline in response and executive functioning from longstanding abilities; performances were impaired with respect to cognitive flexibility and control (i.e., executive functions) . . . Still given estimated intellectual abilities in the low average range and some mildly impaired tests with some variability, the inclusion of a limitation to routine work was also indicated.

*Id.*

### b.   John Owen, PhD and Cathy Simutis, PhD.

The ALJ next considered the opinion of psychological consultative examiner John Owen, PhD and explained why he gave it less weight. AR at 1616-1617. The ALJ determined Dr. Owen's opinion on Duran's mental functioning in the "paragraph B" categories was not restrictive enough considering Duran's ongoing audio hallucinations and psychiatric hospitalization. AR at 1617. The ALJ explained that Dr. Owens based his findings of mild to no difficulty in each area on "a time limited assessment focused on a single examination." *Id.* Compared to Dr. Hamill's review of the "wider longitudinal record," which led to his conclusions of moderate limitations in the paragraph B areas, the ALJ only afforded some weight to Dr. Owen's opinion. *Id.* Similarly, the ALJ gave the opinion of State agency psychological consultant Cathy Simutis, PhD. little weight because it was "inadequately limiting" (i.e., not limiting enough) based on the later evidence Dr. Hamill reviewed. *Id.*

10

### c. *Meagan Parmley, PhD*

The ALJ gave some weight to the opinion of State agency psychological consultant Meagan Parmley, PhD., on reconsideration, for suggesting moderate limitations in all but the first mental functioning area and a limitation to simple work with limited interpersonal interactions. AR at 1617. The ALJ agreed except for the lack of limitation in the first area of mental functioning. AR at 1618. He reasoned that "more precise limitations" for interpersonal interactions and adapting and managing oneself, along with some increased limitations in the first and third mental categories, were warranted by later evidence not available to Dr. Parmely. *Id.* (showing a psychiatric hospitalization and auditory hallucination with some suicidal undertones).

### d. *Athanasios Manole, M.D.*

The ALJ gave little weight to the 2016 opinion of physical consultative examiner Athanasios Manole, because she relied on Duran's subjective reports of hernia symptoms without corresponding objective medical evidence. AR at 1618.  Dr. Manole opined that Duran had moderate limitations in walking as well as limitations in lifting and carrying. *Id.* She also said he could hold a desk job. *Id.*

The ALJ noted that the palpable left inguinal groin-area hernia was longstanding, lacked overlying erythema, required little treatment and no surgery, and that Duran maintained good strength with no acute distress. *Id.*  He also considered that Duran had lifted and carried mattresses until 2016 without it worsening. *Id.*  The ALJ thus determined that the evidence "was more indicative of capability for medium rather than light or sedentary exertion" with some postural and hazard limitations. AR at 1619 (undercutting Dr. Manole's opinion).

### e. *Mark Wener, M.D. and Janice Kando, M.D.*

The ALJ next assigned some weight to the opinions of two State agency medical consultants, Mark Werner, MD (initial) and Janice Kando, MD (reconsideration). *Id.* These

providers opined that Duran is limited to medium exertion, which the ALJ found justified as far as some hernia pain and cramping but inappropriate as far as postural and hazard limitations needed to account for blood sugar variations and hernia pain. *Id.*

### f.  Subramanian Krishnamurthi, M.D.

The final medical opinion[2] the ALJ considered was the testimony of Subramaniam Krishnamurthi, which the ALJ gave significant weight. *Id.* The ALJ agreed with Dr. Krishnamurthi insofar as he found that Duran did not meet or equal a physical listing, had severe diabetes and hypothyroidism, and had non-severe prostate/bladder issues; the ALJ also agreed with Krishmanurthi's decision to leave the insomnia finding to psychological experts, and to recommend hazard limitations in the RFC. *Id.* The ALJ found that this medical opinion aligns with the medical evidence demonstrating that Duran "had generally benign physical findings." *Id.*  He added that the "medication benefit" controlling Duran's prostate/bladder issues rendered his alleged "restless sleep and daytime fatigue [] inconsistent with and out of proportion with the objective medical evidence." AR at 1619-1620. Similarly, Duran needing anxiety and depression medication to sleep "only further goes to show that [Duran] did in fact have significant improvement of fatigue with medication." AR at 1620. Therefore, the ALJ agreed that the urinary/prostate issues were non-severe and that the RFC restrictions to no ladders, scaffolds, unprotected heights, or moving mechanical parts were appropriate. AR at 1620.

The ALJ further explained that he afforded Dr. Krishnamurthi's opinion some weight because Duran's hernia, hypothyroidism, and diabetic symptoms warranted medium work

---

[2] The ALJ also assessed the opinion of Duran's friend, Terry Leal which is not challenged in this appeal. AR at 1620-1621. He afforded this opinion little weight because Mr. Leal's observations were largely conclusory and often relied on Duran's own statements. AR at 1620. The ALJ observed that Mr. Leal's "primary focus" on Duran's fatigue conflicted with the medical evidence showing Duran was "overwhelmingly" alert and awake. AR at 1621. He also discounted the opinion because Mr. Leal did not see Duran very often. *Id.*

restrictions. AR at 1620. He explained that Duran's diabetic neuropathy, hernia pain, and hypothyroidism-related muscle cramps were intermittent and usually mild and so more restrictive limitations were unnecessary. *Id.* (addressing the consequent need for limitations including frequent ramp and stair climbing, balancing, stooping, kneeling, crouching, and crawling). *See id.*

### 3. GAF Scores

The ALJ next discussed Duran's GAF scores in the mid to high fifties, which indicate moderate symptoms of mental impairment. *Id.* He explained that a GAF score is a medical opinion representing a "clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular time, much like a snapshot." *Id.* He emphasized that such scores do not "predict prognosis or treatment outcomes" and are thus of limited use. *Id.* Accordingly, the ALJ afforded the GAF scores little weight but also noted that the moderate symptoms indicated do not conflict with the "mixed" paragraph B findings (on mental functioning). *Id.*

In sum, the ALJ found that Duran's claims of total disability were inconsistent with the overall record. *Id.* However, the ALJ recognized that his symptoms do impose certain limitations which the RFC must take into account. *Id.*

### D.  Step 4 and Step 5

At the next step, the ALJ found that Duran could not perform any of his past relevant work as a mattress maker, teacher aide II, or maintenance engineer. AR at 1621-1622. At the final step, the ALJ found that jobs existed in significant numbers in the national economy which Duran could perform given his age, work experience, and RFC. AR at 1622. The ALJ relied on the testimony of a vocational expert to designate jobs in the unskilled medium work category which Duran could perform with his limitations. AR at 1623. The vocational expert testified that Duran could perform the requirements of three medium, unskilled labor jobs with General Education Development

("GED") reasoning level 2 ratings: 1) hand packager (DOT Code 920.587-018); 2) laundry worker (DOT Code 361.684-014); and 3) janitor (DOT Code 381.687-101). *Id.* The ALJ found that the vocational expert's testimony was consistent with the DOT per SSR-004p although the DOT addresses climbing only generally. *Id.* The ALJ clarified that the expert relied on her experience to differentiate between different types of climbing which Duran can perform with his RFC. *Id.* (finding that the vocational expert's "reliance on her experience to supplement the DOT was well explained . . . and is reasonable").

For the foregoing reasons, and based on this five-step analysis, the ALJ ultimately found that Duran was not disabled. *Id.*

### III.   <u>LEGAL STANDARDS</u>

This Court "review[s] the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting *Mays v. Colvin*, 739 F.3d 569, 571 (10th Cir. 2014)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). The Commissioner's findings are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, requiring more than a scintilla but less than a preponderance. *See* 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The substantial evidence threshold "is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). A decision is not based on substantial evidence if it is overwhelmed by other record evidence. *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1175 (10th Cir. 2014).

IV.     **ANALYSIS**

Duran challenges the ALJ's decision on substantial evidence and legal error grounds. He argues that substantial evidence does not support the RFC because the ALJ improperly assessed medical sources opinions which should have led to a more restrictive RFC. He also contends that the ALJ should have found more severe impairments at step 2 and improperly discounted the GAF scores. Finally, he asserts that the ALJ erred at step 5 by not resolving an apparent conflict regarding in levels between the RFC and the jobs identified at step 5. For the reasons explained below, the Court is not persuaded and the ALJ's decision stands.

**A.  The ALJ properly weighed the medical opinions.**

An ALJ must evaluate and weigh all medical opinions regardless of the source. *Sandoval v. Colvin*, No. CV 14-817 KK, 2015 WL 13651204, at *5 (D.N.M. Dec. 22, 2015) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)). A complete consultative examination report should include the medical source's observations, opinions, and a statement regarding what Plaintiff could do despite his impairments. *Id.* (citing 20 C.F.R. §§ 404.1519n(b), (c)(6), and 416.919n(b), (c)(6)). The opinions of consultative examiners are weighed under stricter standards than treating sources and "can be given weight only insofar as they are supported by substantial evidence in the case record," considering factors like supportability and consistency with other evidence and the length and nature of the treatment relationship. *Griego v. Colvin*, No. CV 15-1112 GJF, 2017 WL 545788, at *6 (D.N.M. Jan. 18, 2017) (citing SSR 96-6p).

1.  The ALJ properly assessed Dr. Parmley's opinion.

Duran challenges the RFC finding of medium work with nonexertional and mental limitations as legal error and unsupported by substantial evidence. [Doc. 19, p. 7]. Under this assertion, Duran first contends that the ALJ improperly assessed the opinion of reconsideration-

level state agency psychologist Meagan Parmely, Ph.D. Duran says that the ALJ failed to account for Dr. Parmley's moderate limitations in concentration, persistence, and pace:

> [Duran] appears able to understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting. A workplace with well-defined expectations and limited interpersonal interactions is recommended.

*Id.* at 7, 9; AR at 112. Duran alleges that the RFC's limitation to unskilled/simple work does not account for Dr. Parmley's mental limitations. [Doc. 19, p. 10]. He says the ALJ erroneously did not include these limitations nor explain why he did not include them. *Id.* at 11.

The Commissioner surmises that Duran's argument "seems to be based on the 2019 district court decision." [Doc. 26, p. 8, 9]. The Commissioner says the argument is now inapplicable because the current RFC and weight afforded Dr. Parmley's opinion "differ[] in material respects" (favorably to Duran) from the prior opinion. [Doc. 26, p. 8, 9]. For context, the 2018 RFC was less restrictive and less detailed than at present:

> [Duran] is limited to simple, routine tasks. He can have frequent interactions with supervisors, and occasional interactions with co-workers and the public. He is limited to tolerating few changes in a routine work setting. Any time off task can be accommodated by his normal breaks.

AR at 933-34. Judge Vidmar found this prior RFC's limitation to "simple, routine tasks (or unskilled work) . . . d[id] not account for moderate limitations" in Duran's abilities to interact with and accept instructions/criticism from supervisors, complete a workday and week without psychological interruptions, and maintain a consistent pace without undue breaks. AR at 937.

The Commissioner urges that this ALJ remedied the prior error. *Id.* at 9-10. Under "paragraph B," the Commissioner emphasizes that ALJ found moderate mental limitations due to reported hallucinations, "low average" information processing, and mild impairment. AR at 1603-1604. However, he recognized that the medical examinations "routinely failed" to corroborate the

hallucinations, Duran showed "no trend of odd or inappropriate behavior, delusions, [or] response to internal stimuli," or excessive fatigue. AR at 1603. The ALJ further noted that medication improved Duran's mental health and he appropriately responded to questions. *Id.*

The Court agrees with the Commissioner that this ALJ properly evaluated and accounted for Dr. Parmley's opinion. The ALJ thoughtfully evaluated and weighed Dr. Parmley's opinion against other relevant evidence. He explained his opinion affording Dr. Parmely's opinion "some weight . . . to the extent it suggested moderate limitations" in all mental functioning categories except the first (understanding, remembering, or applying information). AR at 1617. He agreed with her recommendation to "only simple work with recommendations for limited interpersonal interaction and some adapting/managing oneself provision." *Id.* He accounted for these limitations in the RFC:

> [Duran] is limited to understanding, remembering, and carrying out simple, routine, repetitive 1-3 step instructions; making simple work-related decisions; dealing with occasional changes in a routine work setting; performing work that does not involve assembly line pace; maintaining concentration, persistence, and pace for at least two-hour intervals . . .

AR at 1605. To the extent the ALJ did not adopt Dr. Parmley's opinion regarding adequate interaction with coworkers and supervisors, the ALJ imposed *more* specific, restrictive RFC limitations of "occasionally interacting with supervisors and co-workers, but never interacting with the general public." *Id.* The ALJ found these limitations because of Duran's occasional suicidal thoughts, auditory hallucinations, and anxiety/depression. *Id.*

Duran's position that the RFC should mirror the language of Dr. Parmley's precise limitations is misplaced. As the Commissioner points out, the Tenth Circuit discourages the notion that an ALJ has to "parrot" the exact limitations of a medical source. *Chavez v. Colvin*, 654 Fed. App'x 374, 375 (10th Cir. 2016). It is sufficient that the RFC states how the limitations curtail the

claimant's abilities to do work-related activities. *Smith v. Colvin¸* 821 F.3d 1264, 1269 (10th Cir. 2016).  This can mean limiting a claimant with moderate mental limitations to unskilled work. *Lager v. Comm'r, SSA*, No. 22-4116, 2023 WL 6307490, at *2 (10th Cir. Sept. 28, 2023). The ALJ did more than that here.

The cases Duran cites in support do not persuade the Court. In *Grobery v. Astrue*, the ALJ "*had imposed no limitation at all*, despite abundant medical evidence to the contrary." *Groberg v. Astrue*, 505 F. App'x 763, 769 (10th Cir. 2012) (emphasis added). Based on a single notation showing depression and anxiety ratings of "zero" at one appointment, the ALJ concluded that the claimant had no mental limitations. *Id.*  The Tenth Circuit admonished that "[a] single 'good day' at the doctor's office does not necessarily signify the lack of any occupational effects from mental disorders." *Id.*  That error was not harmless because "the ALJ concluded these ailments would pose *no* limit" on the ability to work. *Id.* (emphasis added). The court also found that advising the vocational expert to recommend only unskilled jobs did not implicitly account for mental limitations and thus cure the ALJ's previous oversight because that tactic "supplie[d] a new factual and/or legal predicate not present in the ALJ's reasoning." *Id.*  at 770.

Duran's case is distinguishable. The ALJ did include moderate mental limitations and relied on the full scope of medical records in formulating his conclusions and RFC. He did not use the vocational expert testimony to supply a new, ex post facto legal or factual basis for the mental limitations. He considered the psychological evidence, both for and against Duran, and crafted mental limitations the Court is able to meaningfully assess. Thus, *Groberg* is inapplicable.

*Chapo v. Astrue* is inapposite as well. In relevant part, the ALJ in *Chapo* effectively rejected an unopposed psychiatric source opinion significantly limiting the claimant's mental ability to work at all, including in the simple/unskilled jobs the vocational expert identified. *Chapo v. Astrue*,

682 F.3d 1285, 1290 (10th Cir. 2012). Notwithstanding, the ALJ only included one mental limitation in his expert hypothetical. *Id.* The Tenth Circuit chided the ALJ for significantly discounting the psychiatric opinion only because the provider had seen the claimant "for merely two months." *Id.*

Duran cites *Chapo* for the statement that "a restriction to 'simple work' is a vague catch-all term which is insufficient to adequately account for mental impairments." [Doc. 19, p.10, 11]. However, that quotation was taken out of the following context:

> As for the restriction to "simple" work, it is doubtful that this vague catch-all term would have been sufficient to capture the various functionally distinct mental limitations recognized by [psychiatric source] Dr. Vega; but in any event, the failure of the ALJ to include his own mental restriction would be fatal to the validity of the hypothetical to the VE.

*Chapo*, 682 F.3d at 1290 n.3. The same is not true here. As the Court will discuss later, the ALJ incorporated the mental limitations into the RFC and in the hypothetical to the vocational expert. He did not simply rely on the expert finding unskilled jobs to compensate for all Duran's mental limitations. *Chapo* is thus inapposite here.

### 2. The ALJ properly assessed Dr. Hamill's opinion.

Duran also challenges the ALJ's assessment of testifying medical expert Dr. Hamill's opinion, which the ALJ gave the greatest weight. Duran alleges that the ALJ did not account for all of Dr. Hamill's moderate limitations but "engaged in impermissible picking and choosing in order to craft an RFC which ultimately did not incorporate all limitations and led to incompatible vocational testimony." [Doc. 19, p. 13]. Duran specifically says the ALJ failed to address Dr. Hamill's limitations on understanding, remembering, and applying information:

> I think that this individual at this point is going to be limited to one, two, three skilled, simple, repetitive tasks. The mental impairment is more significant than the speedy source. This is going to take him out of the complex or even detailed work for all sorts of reasons, I think.

AR at 1646 (emphasis added). Duran urges that the ALJ erroneously failed to incorporate or explain Dr. Hamill's elimination of complex or detailed work. [Doc. 19, p. 14].

Duran believes this alleged oversight leads to harmful error because the step 5 jobs the vocational expert identified require Duran to use level 2 reasoning to "apply common sense understanding to carry out *detailed but uninvolved* written or oral instructions." *Id.* (emphasis added). By implication, Duran alleges that a job necessitating level 2 reasoning is incompatible with Dr. Hamill's statement that mental limitations will take Duran "out of . . . detailed work." *See id.* Thus, Duran asserts that had ALJ properly assessed Dr. Hamill's opinion, the RFC would render Duran incapable of performing the step 5 jobs. *Id.*

The Commissioner responds that the ALJ accounted for Dr. Hamill's preclusion of detailed or complex work by limiting Duran to work involving "a range of simple instructions and simple decisions." [Doc. 26, p. 7, 8]. The Commissioner emphasizes that the ALJ found moderate limitations in the paragraph B categories of 1) understanding, remembering, and applying information and 2) concentrating, persisting, or maintaining pace. *Id.* at 9-11. The ALJ incorporated these paragraph B limitations into the RFC, the Commissioner argues, and thus did not have to "include particular limitation in the RFC" in these two categories. *Id.* at 12. The Commissioner cites cases stating that an ALJ can incorporate moderate limitations in the RFC by capping the complexity and reasoning level of work instead of reciting medical source limitations. *Id.* at 12, 14.

The Court agrees with the Commissioner. The RFC expressly accounts for the moderate limitations the ALJ and Dr. Hamill assessed in areas of maintaining concentration, persistence, and pace and understanding, remembering, and applying information:

> [Duran] is *limited to understanding, remembering, and carrying out simple, routine, repetitive 1-3 step instructions*; making *simple work-related decisions*; dealing with *occasional changes* in a work setting; performing work that *does not involve assembly line pace*; maintaining concentration, persistence, and pace for at least *two-hour intervals . . .*with *standard breaks*.

AR at 1605, 1645 (emphasis added). Duran's focus on Dr. Hamill's statement that mental limitations will "take [Duran] out of the [sic] complex or even detailed work for all sorts of reasons" is hyper-technical and out of context. AR at 1646. Duran believes the ALJ should have specifically adopted (or rejected) Dr. Hamill's apparent exclusion of detailed work because level 2 reasoning does not prohibit "detailed work." *See* [Doc. 19, p. 14]. However, Duran hinges too big a concept on too fine a distinction. Courts in this circuit have addressed similar arguments and found level 2 reasoning jobs sufficient to account for moderate mental limitations when the RFC does not copy-and-paste moderate medical opinion limitations.

In *Retana v. Astrue*, the ALJ gave "great weight" to medical source Dr. Ryan's moderate limitations in several mental functioning categories. *Retana v. Astrue*, No. 11-CV-00105-PAB, 2012 WL 1079229, at *5 (D. Colo. Mar. 30, 2012).  Dr. Ryan opined that the claimant was limited "in his ability to carry out very short and simple instructions" such that he could do work "requiring little judgment and involving simple tasks that could be learned in one month." *Retana*, 2012 WL 1079229, at *5. The ALJ added some limitations and found that Plaintiff could do "simple, unskilled tasks with General Educational Development (GED) levels of 2 in Reasoning." *Id.* at *6. The court found no error in the RFC because it was consistent with Dr. Ryan's conclusions even though "the ALJ did not specifically include every moderate impairment listed in Dr. Ryan's opinion." *Id.* Nor did the ALJ have to "thoroughly discuss each of Dr. Ryan's conclusions" because that "is not the required legal standard." *Id.* The appeal challenged the ALJ's finding that the claimant could perform level 2 reasoning work with his mental limitations. *Id.* The court did not

agree and reminded the claimant that its job "is not to reweigh the evidence and determine whether it would have arrived at the same conclusions as the ALJ." *Id.* at *7.

The District of Kansas also addressed this issue and explained the critical difference between GED reasoning levels and RFC limitations. *Lesley A. H. v. Saul*, No. CV 19-2509-JWL, 2020 WL 3545626, at *16 (D. Kan. June 30, 2020). In relevant part, the mental RFC assessed the claimant as able to "understand, remember, and carry out *simple, routine, and repetitive* tasks . . . involving only *simple* work-related instructions and decisions." *Id.* at 15 (emphasis added). The ALJ found level 2 reasoning jobs appropriate based on vocational expert testimony. *Id.* The claimant alleged an unresolved conflict between the DOT and expert testimony, arguing she could not do level 2 reasoning jobs because the ALJ did not find her capable of *detailed* instructions. *Id.* at 14.

The court surmised that the argument "rel[ied] upon her assumption that any job with a reasoning level greater than one is beyond the Mental RFC." *Id.* That assumption, it noted, comes from the fact that the DOT defines '01 Level Reasoning Development' using the term '*simple . . . instructions*[] . . . but uses the term '*detailed . . . instructions*' in defining '02 Level Reasoning Development[].'" *Id.* (emphasis added). The court rejected the assumption that "'simple . . . instructions' in the DOT definition of '01 level reasoning' must be equivalent to 'simple . . . instructions'" in the RFC. *Id.* at 16. It explained that GED reasoning levels and RFC mental categories refer to distinct inquires which are not interchangeable:

> Reasoning level in the DOT relates to the educational background a particular occupation requires whereas mental abilities in a Mental [RFC] Assessment represent 20 mental functional abilities grouped into 4 categories . . . While educational requirements and mental abilities intuitively appear to be related, Plaintiff has shown no direct correlation . . . between [a medical source] opinion regarding Plaintiff's mental abilities and the DOT GED reasoning levels.

*Id.* Accordingly, the court admonished, "Plaintiff may not create a conflict based upon her or her attorney's lay reading of the DOT in opposition to a vocational expert" and upheld the ALJ. *Id.*

Here, Duran similarly assumes that Dr. Hamill's use of the term "detailed" in the RFC is equal to, or dispositive of, the meaning of "detailed" in the GED reasoning levels. Duran likewise fails substantiate the assumption. Instead, he tries to obfuscate the vocational expert's testimony to find a conflict premised on his own interpretation of "detailed" in the DOT. To that end, the ALJ did not have to include each and every limitation of Dr. Hamill in order for the RFC to account for Duran's mental restrictions. *See Retana*, 2012 WL 1079229, at *5. The Court will not reweigh the evidence to find error in the analysis of Dr. Hamill's opinion.

### 3.   The ALJ properly assessed Dr. Manole's opinion.

Duran also alleges that the ALJ erred in giving little weight to consultative examiner Dr. Manole's hernia-related limitation. [Doc. 19, p. 15-17]. Dr. Manole limited Duran to lifting or carrying up to 20 pounds and holding a desk job. *Id.*  The ALJ found that Duran could lift and carry up to 50 pounds per the medium work requirements. *Id.* at 17; AR at 1605. Duran characterizes the ALJ's weight determination as the result improper cherry-picking of evidence to include Duran's relatively normal physical examinations, longstanding hernia with minimal treatment, and previous work stacking mattresses without worsening. [Doc. 19, p. 16-17].  He also complains that the ALJ did not give "specific and legitimate" reasons for rejecting Dr. Manole's limitation. *Id.* at 18.

The Commissioner responds that Duran asks the Court to reweigh the evidence and reach a different conclusion. [Doc. 26, p. 15]. The Commissioner notes that the ALJ did not dispute the existence of Duran's palpable left inguinal hernia but found medium work more consistent with

the medical evidence and opinions. *Id.* at 15-16. The Commissioner also contends that Dr. Manole's limitations lack support because they simply track Duran's admitted abilities. *Id.* at 16.

The Court agrees that Duran's challenge urges the Court to reweigh the evidence which it of course cannot do. The ALJ properly assessed Dr. Manole's opinion and explained why he ultimately did not find it persuasive:

> Little weight is given to Dr. Manole's assessment. The majority of the statements were fully attributed to subjective reports alone without consideration of the objective medical evidence. This is clear as the reasons for the limitations were listed next to the statements and Dr. Manole actually opined that the claimant's activities of daily life would not be limited by the physical impairments.

AR at 1618. The ALJ provided a specific reason for discounting Dr. Manole's limitations—recitation of Duran's stated limitations—which the Court can meaningfully review. The ALJ also discussed the other evidence he considered. AR at 1618-1619. This included hernia examinations showing no erythema, good strength, no objective or acute stress, little treatment, no surgery advised, and mattress-stacking job until 2016. AR at 1618-19. This led the ALJ to conclude that the evidence, "was more indicative of capability for medium rather than light or sedentary exertion." AR at 1619. He did, however, find certain postural and hazard limitations necessary. *Id.* The ALJ thus considered Dr. Manole's opinion against other evidence, found it lacking, and so gave the opinion little weight. The Court will not reweigh the evidence nor opine on its strength.

**B. The ALJ properly assessed Duran's severe impairments at Step Two.**

Duran contends that the ALJ should have found his enlarged prostate and insomnia to be severe impairments at step 2. [Doc. 19, p. 18]. Duran also says that, even as non-severe impairments, the ALJ failed to consider all limitations from these conditions. *Id.* He characterizes the ALJ's analysis as "regurgitating a summary of the medical evidence" showing improvement of enlarged prostate symptoms and fatigue with medication. *Id.* at 18-19. He urges that if the ALJ

had properly assessed fatigue and prostate-related limitations, the prostate and fatigue conditions would be severe, and the RFC would have been more restrictive. *Id.* at 19-20.

The Commissioner defends that the ALJ reasonably assessed and accounted for Duran's enlarged prostate and insomnia in the RFC. [Doc. 26, p. 16, 17]. The Commissioner asserts that Dr. Krishnamurthi's and Dr. Hamill's testimonies are substantial evidence supporting the ALJ's decision. *Id.* at 17. Dr. Krishnamurthi testified that the prostate was controlled with medication, which allowed Duran to work with some postural and environmental limitations. *Id.* Dr. Hamill, whose opinion the ALJ afforded great weight, did not count insomnia as a severe impairment. *Id.* Finally, the Commissioner recounts the medical evidence the ALJ considered when declining to find the enlarged prostate and insomnia severe impairments. *Id.* at 17-18.

 "The failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) (holding that the ALJ did not err in declining to find the claimant's headaches a severe impairment at step 2 because "the ALJ found six other impairments severe"). The same is true here. At step 2, the ALJ found six severe impairments: diabetes mellitus, hypothyroidism, hernia, depression, anxiety, and mild neurocognitive disorder. AR at 1597. The ALJ proceeded through step 5 to ultimately find Duran not disabled. *See AR* at 1597-1623. The ALJ's decision not to find the enlarged prostate and insomnia severe is not harmful error.

Moreover, the Court is not to reweigh the evidence to reach a different outcome than the ALJ, whose decision must be supported only by "more than a scintilla" of evidence. *See Bowman v. Astrue,* 511 F.3d 1270, 1272 (10th Cir. 2008).  The ALJ properly discussed Duran's prostate and insomnia in his step 2 analysis and explained why he found them non-severe. AR at 1598. Among other findings, the ALJ considered evidence that "medications were prescribed for both insomnia

and his prostate," he did not want to see a urologist, he underwent multiple medication changes, and in "April 2022, he admitted that he had adequate symptom control of benign prostatic hyperplasia on Doxazosin." *Id.* The ALJ also noted that vitamin deficiencies and sleep apnea contributing to fatigue were appropriately treated. AR at 1599. The sleep apnea was mild and did not necessitate CPAP assistance, the ALJ documented, which Duran refused to use in any event. *Id.* Substantial evidence support the step 2 findings.

### C.  The ALJ properly assessed Duran's GAF scores.

Duran next contends that the ALJ "improperly disregarded the GAF ratings" (in the mid-to-high fifties) by giving them little weight. [Doc. 19, p. 20, 21]. Duran contests the ALJ's rationale that the GAF ratings "only represent a 'snapshot' of the presentation of information," do not give a "longitudinal picture" of mental functioning, do not "predict prognosis or treatment outcomes," and do not "directly correlate" to mental disorder listing severity requirements. *Id.* Duran cites mental health evidence which he believes is consistent with the GAF scores. *Id.*  at 21. Duran advances that the ALJ "committ[ed] legal error by substituting his 'lay assessment of the plaintiff's symptoms for [the physician's] clinical medical judgment as reflected in the GAF score.'" *Id.* at 22 (citing *Medina v. Astrue*, 847 F. Supp. 2d 1314 (10th Cir. 2012)).

The Commissioner counters that Duran wants the Court to reweigh the evidence by recharacterizing it as supporting the GAF score. [Doc. 26, p. 19]. The Commissioner maintains that the ALJ did not err despite discussing the treatment notes Duran cites because "they were not uncontroverted evidence he chose not to rely on [or] significantly probative evidence he rejected"; rather, the ALJ "discussed [Duran's] mental conditions in detail and the two notes [Duran cited] did not add anything significantly probative." *Id.*  at 20. The Commissioner cites case law stating that ALJs may discount GAF scores and criticizes Duran's case law as inapplicable. *Id.*  at 21.

"The GAF [Global Assessment of Functioning] is a subjective rating on a scale of 1 to 100 of the clinician's judgment of the individual's overall level of functioning." *Holcomb v. Astrue*, 389 F. App'x 757, 759 n.1 (10th Cir. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed.2000) at 32). GAF scores in the 41-50 range indicate serious symptoms or impairment in social or occupational functioning (like inability to keep a job). *Id.* GAF scores are not necessary to formulate an accurate RFC. *Id.* at 759. Moreover, these scores "cannot, by themselves, establish a medically determinable impairment, constitute a medical opinion, or be considered the opinions of a treating source" because they are not the opinions of acceptable medical sources. *Id.* (internal citations omitted).

The Court agrees with the Commissioner. The ALJ stated he took Duran's the GAF scores in the "mid to high fifties" into consideration. AR at 1621 (citing 12F; 13F/21; 14F). He then explained the problems with the GAF as an accurate metric of mental health and afforded it little weight. *Id.* However, the ALJ noted that Duran's scores indicated moderate mental symptoms, which "is not inconsistent with the paragraph B ratings showing mixed [mental] findings." *Id.* The Court sees no error where Duran does not dispute the GAF score itself, nor that the score indicates moderate symptoms, nor that the ALJ's findings show moderate mental limitations. Particularly so considering the Tenth Circuit also disfavors lending credence to GAF scores:

> The Commissioner has declined to endorse the use of GAF scores for use in disability determinations, concluding they have no "direct correlation to the severity requirements" of the mental disorders listings. *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000); *see also Rose v. Colvin*, 634 Fed. Appx. 632, 636 (10th Cir. 2015) (finding no error in an ALJ's failure to discuss a GAF score of 40, because GAF scores have no direct correlation to disability and the current *Diagnostic and Statistical Manual of Mental Disorders* has discontinued the use of the GAF due to its "conceptual lack of clarity" and "questionable psychometrics in routine practice" (internal quotation marks omitted)). We conclude the ALJ did not err in his discussion of the medical evidence or in his evaluation of the GAF scores.

*Watts v. Berryhill*, 705 F. App'x 759, 762 (10th Cir. 2017). The same principles apply here.

The case Duran cites, *Medina v. Astrue*, is unpersuasive. [Doc. 19, p. 22]. *Medina* concerned an ALJ's "flouting of the mandate rule" with respect a medical opinion the ALJ rejected because it did not comport with a GAF score suggesting serious impairment. *Medina v. Astrue*, 847 F. Supp. 2d 1314, 1321 (D. Colo. 2012). That court found that the ALJ's "insistence on some sort of objective or standardized measure to diagnose mental impairment was contrary to law" and improper. *Id.* Unlike in *Medina*, Duran does not allege, nor does the record reflect, that the ALJ rejected a medical opinion because of a GAF score. To the contrary, the moderate GAF score aligns with the moderate mental findings in other medical opinions. To the extent Duran's litany of citations to Duran's mental health issues present the Court with evidence to reweigh, the Court declines to do so. The Court finds no error with the ALJ's treatment of the GAF score.

### D. The ALJ properly assessed the vocational expert's testimony which served as substantial evidence supporting the ALJ's Step Five findings.

The burden shifts to the Commissioner at step five to show by substantial evidence that sufficient jobs exist in the national economy for a hypothetical person with the claimant's impairments, age, education, and work experience. *See Jensen v. Barnhart,* 436 F.3d 1163, 1168 (10th Cir. 2005); *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). An ALJ may rely on a vocational expert's testimony for substantial evidence. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019). The hypothetical question posed to the vocational expert "must reflect with precision all—and only—the impairments and limitations borne out by the evidentiary record." *Rivera v. Berryhill*, 242 F. Supp. 3d 1226, 1237 (D.N.M. 2017) (citing *Grotendorst v. Astrue*, 370 Fed. Appx. 879, 883 (10th Cir. 2010)). The response to the hypothetical including all impairments constitutes substantial evidence for the ALJ's decision. *Id.* (internal citation omitted).

However, an ALJ is required to "investigate and elicit a reasonable response for any conflict between the [DOT] and expert testimony before the ALJ may rely on the expert testimony as substantial evidence to support a determination of non-disability." *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999). Similarly, SSR 004p requires:

> before relying on [vocational expert] ... evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] ... and information in the Dictionary of Occupational Titles (DOT) ... and [e]xplain in the determination or decision how any conflict that has been identified was resolved.

SSR 004p, 2000 WL  1898704, at *1 (Dec. 4, 2000).

Duran argues that the ALJ erred at step five in several respects. [Doc. 19, p. 22]. First, he says that the ALJ "erred in creating an RFC that failed to reflect all of Mr. Duran's limitations" because "if vocational testimony is based upon information that does not include all of [Duran's] impairments, it is not substantial evidence." *Id.* at 23. Second, he states that the ALJ failed resolve a conflict between the expert testimony of level 2 reasoning jobs and the ALJ's medium work finding with limitations to simple, routine, repetitive 1-3 step instructions and simple work decisions. *Id.* Duran urges that level 2 reasoning is incompatible with the mental limitation to simple, routine work and decisions. *Id.* at 24. He says once jobs requiring level 2 reasoning are eliminated, no jobs would be left Duran could perform. *Id.* at 21.

The Commissioner first responds that the vocational expert made a harmless scrivener's error regarding the DOT number for the right level 2 reasoning janitor occupation, DOT No. 381.687-018, when he instead cited DOT No. 381.687-010 requiring reasoning level 3. *Id.* at 22 (emphasis added). Regarding Duran's main argument, the Commissioner clarifies that Dr. Hamill testified that Duran likely could not perform "detailed work," but did *not* say that Duran could not carry out detailed *instructions*. *Id.* at 22. The Commissioner cites cases recognizing the distinction

between "simple instructions" and "simple work" to support that the step 5 jobs are reasonable and not the product of error. *Id.* at 22-23.

The Court finds that the ALJ properly included all medium, unskilled work RFC limitations, including the moderate mental limitations, in the hypothetical to the vocational expert:

> This time, I'm going to ask you to assume a hypothetical individual claimant's age, education, past work experience. Ask you to further assume that individual is limited by his medically determinable impairments to medium work with able (sic) to carry up to 50 pounds occasionally, 25 frequently. Sitting, standing, and walking up to six hours in an eight-hour day. Pushing and pulling as much as lifting and carrying. Additional limitations would include frequent climbing of ramps and stairs. No ladders or scaffolds. As well as frequent balancing, stooping, kneeling, crouching, and crawling. And this individual should have no exposure to unprotected heights or moving mechanical parts. Finally, this individual would be limited to understanding, remembering, and carrying out simple, routine, repetitive one-to-three-step tasks. And they would be limited to making simple, work-related decisions. They would be able to deal with occasional changes in a routine work setting. They should be limited to performing work that does not involve assembly line [p]ace. They would be limited to maintaining concentration, persistence, and pace for two-hour intervals over an eight-hour workday, forty-hour workweek with standard breaks. They would be limited to occasional interaction with supervisors and coworkers. No interaction with the general public . . . Would there be other medium, unskilled jobs that would fit that hypothetical?

AR at 1671. In response, the vocational expert identified, and the ALJ adopted in his decision, three unskilled jobs with a GED reasoning level of 2: (1) Hand Packager (DOT Code 920.587-018)[3]; (2) Laundry Worker (DOT Code 361.684-014)[4] and (3) Janitor, cited as (DOT

---

[3] The DOT describes hand packager generally as follows: "Packages materials and products manually, performing any combination of following duties: Cleans packaging containers. Lines and pads crates and assembles cartons. Obtains and sorts product. Wraps protective material around product. Starts, stops, and regulates speed of conveyor. Inserts or pours product into containers or fills containers from spout or chute. Weighs containers and adjusts quantity. Nails, glues, or closes and seals containers. Labels containers, container tags, or products. Sorts bundles or filled containers. Packs special arrangements or selections of product. Inspects materials, products, and containers at each step of packaging process. Records information, such as weight, time, and date packaged." Requires "*GOE: 06.04.38 STRENGTH: M GED: R2 M1 L1 SVP: 2 DLU: 88.* Dictionary of Occupational Titles, Dep't of Labor, 4th Ed., Rev. 1991, https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT03A.

[4] The DOT generally describes "laundry worker" as follows: "Washes and irons wearing apparel, sheets, blankets, and other linens and clothes used by employees of logging, construction, mining, or other camp, or washes uniforms, aprons, and towels in establishments supplying employees with these linens. Uses equipment usually found in household or in small laundry." *Id.* Requires "*GOE: 05.12.18 STRENGTH: M GED: R2 M1 L1 SVP: 2 DLU: 77." Id*

Code 381.687-01<u>0</u>) but intended as (DOT Code 381.687-01<u>8</u>)[5] explained further below. AR at 1671, 1623. The ALJ asked the vocational expert if his testimony was consistent with the DOT and the expert replied it was. AR at 1672. The ALJ requested clarification between climbing ramps and stairs in the DOT, which the expert provided. *Id.* at 1672-1673. No error occurred during this exchange and no crucial RFC limitations were omitted from the hypothetical such that the three jobs identified are inappropriate for Duran.

The Court does not identify harmful error in the DOT number for the janitor position. The vocational expert cited the DOT number for the reasoning level 3 janitor position (DOT No. 381.687-01<u>0</u>), instead of the reasoning level 2 janitor position (DOT Code 381.687-01<u>8</u>), but described it as a level 2 reasoning position. AR at 1671. The ALJ adopted the incorrect number but the correct reasoning level of 2. AR at 1623.  Scrivener's error in the social security context occurs where the ALJ's intent was apparent despite the mistake. *See S.V.P. v. Kijakazi*, No. 21-CV-03483-NRN, 2022 WL 17751248, at *2 (D. Colo. Dec. 16, 2022). The Court finds the ALJ intended to cite the DOT number assigned to the janitor position requiring only level 2 reasoning because the numbers only differ with respect to the last digit, the vocational expert stated it was a level 2 reasoning job in alignment with Duran's limitations, and the ALJ described it as such. AR at 1671,

---

[5] The DOT generally describes "cleaner industrial" or "janitor" as follows: "scrubber; sweeper; trash collector; vacuum cleaner; waste collector. Keeps working areas in production departments of industrial establishment in clean and orderly condition, performing any combination of following duties: Transports raw materials and semifinished products or supplies between departments or buildings to supply machine tenders or operators with materials for processing, using handtruck. Arranges boxes, material, and handtrucks or other industrial equipment in neat and orderly manner. Cleans lint, dust, oil, and grease from machines, overhead pipes, and conveyors, using brushes, airhoses, or steam cleaner. Cleans screens and filters. Scrubs processing tanks and vats. Cleans floors, using water hose, and applies floor drier. Picks up reusable scrap for salvage and stores in containers. Performs other duties as described under CLEANER (any industry) I Master Title. May burn waste and clean incinerator. May pick up refuse from plant grounds and maintain area by cutting grass or shoveling snow. May operate industrial truck to transport materials within plant. May start pumps to force cleaning solution through production machinery, piping, or vats. May start pumps to lubricate machines." Requires *"GOE: 05.12.18 STRENGTH: M GED: R2 M1 L2 SVP: 2 DLU: 88."* *Id.*

1623. Upon correction of the cited DOT number, the result would be the same for Duran.  This error is thus harmless.

The Court does not find that there is an unresolved inconsistency between the medium work RFC with additional mental limitations and the level 2 reasoning jobs the vocational expert identified. Duran here renews his challenge to the ALJ's assessment of Dr. Hamill's opinion, arguing that Dr. Hamill's statement that limitations exclude Duran from detailed work conflicts with the level 2 reasoning requirement to "apply common sense understanding to carry out detailed but uninvolved written or oral instructions." Dictionary of Occupational Titles, General Education Development (GED), 02 Level Reasoning Development, https://occupationalinfo.org/appendxc_1.html. As described above, Duran perceives a conflict where there is none through his non-expert interpretation of the term "detailed" in the DOT. *See Lesley*, 2020 WL 3545626, at *16. He assumes that Dr. Hamill's use of the term "detailed" in the RFC controls the meaning of "detailed" in the GED levels without addressing the sentence or broader context in which each word appears. He cites one case to substantiate his assumption, which the Court addresses below. In keeping with the earlier analysis of the same issue, no reversible conflict exists based on Duran's subjective reading of one word found in two distinct sources of authority.

To the extent that Duran argues the ALJ had to discuss and include all of Dr. Hamill's conclusions, that is "not the required legal standard." *See Retana*, 2012 WL 1079229, at *5. The ALJ considered the evidence of Duran's cognitive health and behavioral conditions to craft moderate mental limitations in most paragraph B categories. AR at 1601-1604.  He incorporated those mental limitations into the RFC with tailored non-exertional restrictions, discussed the

reasons therefor, and incorporated them into the hypothetical to the VE. AR at 1605, 1608-1618. The Court will not second-guess the ALJ and reweigh the evidence.

The non-precedential *Temple* case Duran cites does not convince the Court on this point. In relevant part, that court remanded a case for further assessment of a medical source's moderate limitation on the plaintiff's ability to carry out instructions due to "task impersistence," which the court noted "is not a term that ordinarily appears" in social security cases. *Temple v. Berryhill*, No. CV 16-1007 KBM, 2017 WL 6372660, at *8 (D.N.M. Dec. 12, 2017). The ALJ did not "explicitly recognize" that this limitation did not reference "either simple or detailed instructions." *Id.* at *9. The court inferred that the ALJ interpreted "task impersistence" as a limitation to "*simple* instructions only"; however, the court was "not comfortable" with the inference because it imposed a "post hoc" explanation into the ALJ's decision. *Id.* It thus remanded for further analysis. *Id.*

Duran relies on an add-on to the above reason for remand. Temple argued that the level 2 reasoning job the ALJ found at step five was inconsistent with the RFC limitation to simple, routine, repetitive tasks. *Id.* at *13. The court mused that the ability to understand "detailed but uninvolved instructions seem[ed] to conflict" with the RFC limiting Temple to "simple, routine and repetitive tasks." *Id.* (internal citation omitted). Thus, "[b]ecause the Court [was] remanding this case for other reasons," it directed that the ALJ may as well resolve any inconsistences between this RFC and level 2 reasoning. *Id.*

The Court is reticent to follow *Temple* because it did not make any findings nor analyze how level 2 reasoning might conflict with the RFC. It is not clear whether the court would have remanded on that basis alone. The court expressly remanded because of an ambiguous, non-term-of-art phrase that required it to speculate. The collateral nature of *Temple's* level 2 reasoning/RFC remand is not enough to support remand here. This Court has not found grounds to remand on a

separate basis and will not employ a "might as well" approach.  The Court finds that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's step five analysis and that no legal errors fatally taint the analysis.

**V.**     **CONCLUSION & ORDER**

For the foregoing reasons, the Court finds that the ALJ's decision was supported by substantial evidence and free from harmful legal errors.

**IT IS THEREFORE ORDERED** that Duran's Motion to Reverse and Remand [Doc. 19] is hereby **DENIED**.

**IT IS SO ORDERED.**

JERRY H. RITTER
U.S. MAGISTRATE JUDGE
PRESIDING BY CONSENT